# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| CA, INC. d/b/a CA TECHNOLOGIES (A BROADCOM COMPANY), a Delaware corporation, | |
| Plaintiff, | Civil Action No. 1:25-CV-00489-TCB |
| v. | **JURY TRIAL DEMANDED** |
| DELTA AIR LINES, INC., | |
| Defendant. | |

## DELTA AIR LINES, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS

## TABLE OF CONTENTS

Page

BACKGROUND ................................................................ 3

I.      Delta bought a subscription to use the DX NetOps software
        to monitor devices on Delta's network. .................................... 3

II.     Delta also bought a license to use the DX NetOps software
        from CA's partner, Kyndryl. ........................................... 5

III.    CA accused Delta of monitoring too many devices on its network........ 6

EXHIBITS TO DELTA'S MOTION TO DISMISS............................... 9

ARGUMENT AND CITATION TO AUTHORITY ........................... 11

I.      CA's claims are breach of contract claims masquerading
        as a copyright action. .................................................. 11

        A.    The Authorized Use Limitation is not a condition on Delta's
              use of copies of the DX NetOps software. ..................... 13

        B.    The Authorized Use Limitation is not grounded in any of
              CA's exclusive rights under the Copyright Act. ........... 15

II.     CA failed to state a copyright claim based on the license count
        methodology in the SPD to which Delta never agreed. ........... 22

CONCLUSION.............................................................. 25

This is a breach of contract case masquerading as a copyright action. In fact, the parties have been litigating that contract dispute in Gwinnett County Superior Court since August 2024. Not content with one lawsuit, however, Plaintiff CA, Inc. ("CA") filed this copyright claim five months later. But, contrary to CA's assertion, CA has no claim to "vindicate its rights under the Copyright Act."[1] This Act grants copyright holders a limited set of rights, namely "the right to reproduce the copyrighted work, to prepare derivative works, and to distribute copies to the public."[2] And while a copyright holder can define the scope of its license, it cannot enlarge the scope of the Copyright Act; only Congress can do that.[3]

CA does not allege that Defendant Delta Air Lines, Inc. ("Delta") violated any of these exclusive rights under the Copyright Act. Instead, CA alleges simply that Delta breached the "Authorized Use Limitations" under the parties' contracts (something CA also alleges in its breach of contract claim in state court). The parties' contracts authorized Delta to use copies of CA's DX NetOps software, which is installed on Delta's servers and monitors the devices on Delta's network. The Authorized Use Limitation does not limit the number of copies of the software Delta can use but instead limits the number of devices those copies can monitor.

---

[1] Compl. ¶ 7.

[2] *Lipscher v. LRP Publ'ns, Inc.*, 266 F.3d 1305, 1311 (11th Cir. 2001) (citing 17 U.S.C. § 106).

[3] *See, e.g.*, *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1316 (Fed. Cir. 2005).

That limitation is not grounded in the Copyright Act. Thus, even if CA were correct that Delta breached this limitation, CA has, at most, a garden-variety contract claim, one it is *already litigating in state court*.

Beyond that, CA's claims in both cases rest largely on terms that Delta never accepted. CA insists that a 2022 document called "Specific Program Documentation" set forth a new method to count the number of devices the software is monitoring, and under that new counting methodology, Delta's use far exceeded the Authorized Use Limitation. But the Specific Program Documentation is not part of any contract Delta signed, which is fatal to CA's claims because under the parties' Master License Agreement, any change to licensing terms like this must be found in a signed writing. CA's complaint in this Court pointedly fails to allege that Delta issued any such signed writing to adopt the methodology that CA would impose—because Delta never signed such a contract.

In sum, this action is a futile attempt to bootstrap a copyright claim onto CA's breach of contract claim, which is itself largely based on terms to which Delta never agreed. For these reasons, Delta moves to dismiss.

## BACKGROUND

### I.  Delta bought a subscription to use the DX NetOps software to monitor devices on Delta's network.

This case involves Delta's use of CA's DX NetOps software. DX NetOps provides "a single network operations center ('NOC') portal" from which the

software monitors and collects information about the devices on the user's network and converts that information "into actionable insights for fast and easy troubleshooting."[4] This software is not installed on the devices it monitors, and CA does not contend it is.[5]

Delta's use of the software is subject to the parties' 1989 Master License Agreement.[6] Under this agreement, CA agreed to issue Delta "Order Forms" to use CA software.[7] The Master Agreement provides that "[w]hen CA accepts an Order Form, [Delta] will have, subject to the terms and conditions of this Agreement, a nontransferable and nonexclusive license to use the Program Product(s), optional features, if any, and related materials (collectively the 'Licensed Program') described in the Order Form(s) referencing [the Master Agreement]."[8]

The Master Agreement's merger clause provides that the Master Agreement "includ[es] … the Order Form(s) and any other exhibits attached to" the Master Agreement, which constitute "the entire agreement between CA and [Delta] with respect to the Licensed Program."[9] Thus, the Order Forms are "subject to the terms

---

[4] *See* Compl. ¶ 23.

[5] *See id.*

[6] *Id.* ¶ 17. **Ex. 1** is a true and correct copy of the Master Agreement. As explained below, this Court may consider this and other documents without converting Delta's motion to a motion for summary judgment.

[7] Ex. 1 at 2. Exhibit pincites refer to the PDF page number for each exhibit.

[8] *Id.*

[9] *Id.*

and conditions of" the Master Agreement.[10] And the Master Agreement provides that "[n]o alteration or modifications of [the Master Agreement] will be valid unless made in writing and signed by the parties."[11]

This case arises out of the 2023 Order Form granting Delta a "Subscription" to use CA's DX NetOps software.[12] In a chart on the 2023 Order Form under a heading called "Authorized Use Limitation," the Order Form limited the number of Devices that DX NetOps was authorized to monitor on Delta's network.[13] This was a "Product Migration," meaning that CA terminated a prior version of the DX NetOps software and migrated Delta's subscription to cover this new version.[14] The 2023 Order Form provides that "[a]ll financial obligations relating to the Original Product(s) remain valid and enforceable and are applicable to the Migrated Product(s) for which Delta will retain perpetual license rights."[15]

Delta and CA later signed a renewal Order Form to extend Delta's use of this subscription through 2024 and 2025 (the "2024 Order Form").[16] This 2024 Order Form again noted that Delta's use of the software was by "Subscription," and also provided a chart with an "Authorized Use Limitation" column indicating the

---

[10] *Id.*

[11] *Id.*

[12] Compl. ¶ 22. **Ex. 2** is a true and correct copy of the 2023 Order Form.

[13] *Id.* at 3.

[14] *Id.* at 4.

[15] *Id.*

[16] Compl. ¶ 31. **Ex. 3** is a true and correct copy of the 2024 Order Form.

number of "Device[s]" the parties expected DX NetOps to monitor on Delta's network.[17]

## II.    Delta also bought a license to use the DX NetOps software from CA's partner, Kyndryl.

Delta also entered into a master agreement with Kyndryl, effective January 1, 2023 ("Kyndryl Contract") which governs Kyndryl's issuance of Statements of Work ("SOWs") for licensing software.[18] Attached to the Kyndryl Contract is a fully executed "Statement of Work #3" (the "Kyndryl SOW").[19] Like the CA Order Forms, the Kyndryl SOW authorized Delta to use CA's DX NetOps software and acknowledged ██████████████████████████[20] The SOW provided a similar chart indicating an additional number of Devices DX NetOps could monitor.[21] This subscription runs through 2027.[22] CA does not allege that Kyndryl terminated the Kyndryl Contract or SOW.

The Kyndryl Contract incorporates the Statements of Work as well as any exhibits or attachments to those Statements of Work.[23] The Kyndryl Contract also recognizes that ██████████████████████████

---

[17] Ex. 3 at 3.
[18] Compl. ¶ 30. **Ex. 4** is a true and correct copy of the Kyndryl Contract, and **Ex. 4-A** contains the relevant excerpts of that Contract.
[19] Ex. 4-A at 6–10; Ex. 4 at 407–411.
[20] Ex. 4-A at 6–10; Ex. 4 at 407–411.
[21] Ex. 4-A at 9; Ex. 4 at 410.
[22] Ex. 4-A at 9–10; Ex. 4 at 410–411.
[23] Ex. 4-A at 3; Ex. 4 at 6, § 1.4.1.

████████████████████████████████████████████████

████████████████████████████████[24] And like the Master Agreement,

the Kyndryl Contract prohibits any "████████████████████████████

██████████████" absent a writing signed by both sides.[25]

### III.    CA accused Delta of monitoring too many devices on its network.

In January 2024, CA received a report that it believed showed that DX

NetOps was monitoring more Devices on Delta's network than authorized under

the CA Order Forms and Kyndryl SOW.[26] CA's main basis for this conclusion was

its insistence that, when Delta executed the 2023 Order Form, Delta agreed to new

terms in a document called "Specific Program Documentation" or "SPD."[27] Under

the SPD, a licensee would have to buy an additional license for every 10 "Pingable

Devices (*i.e.*, devices that cannot be managed via SNMP)."[28] CA does not allege

that this Pingable provision was part of any prior versions of CA's licenses.

Delta disputed that it was subject to the Pingable requirement in the SPD.[29]

Indeed, no DX NetOps Order Form or contract references the SPD, let alone

---

[24] Ex. 4-A at 3; Ex. 4 at 6, § 1.4.1.
[25] Ex. 4-A at 4; Ex. 4 at 58, § 27.9.
[26] Compl. ¶ 33.
[27] *Id.* ¶¶ 4, 25. **Ex. 5** is a true and correct copy of the SPD.
[28] Compl. ¶ 3; *see also* Ex. 5 at 3.
[29] Compl. ¶¶ 3–4.

purports to incorporate the terms of the SPD into an enforceable contract. Nor is the SPD executed by any Party, as the Master Agreement requires.

CA nonetheless insisted that DX NetOps's monitoring of these additional Pingable Devices amounted to a "Material Breach" of contract and in August of 2024, CA sent a "Notice of Material Breach" letter to Delta saying as much.[30] CA made various demands in that letter and attached an invoice to true-up Delta's purported excessive use of the DX NetOps software.[31] The Invoice charged a "████████████████" of nearly $6 million, and according to the letter, if Delta failed to pay by its deadline, "████████████████"[32] CA further claimed that any "████████████████████████████████████████████████████████████████████████████████████████████"[33]

---

[30] Compl. ¶ 37. *See also* **Ex. 6**, which is a true and correct copy of the Aug. 20, 2024 Letter alleging a "Material Breach" of the parties' contract.
[31] Ex. 6 at 5.
[32] *Id.* at 3, 5; *see also* CA's Answer, Affirmative Defenses and Counterclaims at 10, ¶ 36, *Delta v. CA*, No. 24-A-07778-10 (Superior Ct. of Gwinnett Cty. Nov. 6, 2024) ("Ans. and Countercl."). **Ex. 7** is a true and correct copy of CA's Answer and Counterclaims. This Court should take judicial notice of the pleadings from Gwinnett County, as explained below.
[33] Ex. 6 at 3.

Delta did not pay the invoice and instead, in August 2024, sued CA in Gwinnett County Superior Court, bringing breach of contract claims.[34] Delta alleged that CA breached the parties' agreements by issuing an invalid invoice based on terms in a document to which Delta never agreed and sought to impose an unreasonable fee untethered to the parties' contract and course of dealings.

When it answered in Gwinnett County on November 6, 2024, CA counterclaimed, bringing its own breach of contract claim.[35] On the question of termination, CA stated that "it has reserved its rights to terminate the relevant Orders due to Delta's material breaches and unauthorized use, but denies that CA has done so."[36] Rather than terminating the license, CA affirmed the license and reiterated its demand for Delta to pay the $6 million invoice.[37] CA faulted Delta for not paying that amount and accused Delta of continuing to "willful[ly] breach … these agreements."[38] Discovery on the parties' respective breach of contract claims is ongoing in Gwinnett County and ends in early September 2025.

Meanwhile, several months after Delta filed suit, on February 3, 2025, CA brought this action to "vindicate its rights under the Copyright Act."[39]

---

[34] *See* Compl. ¶ 7.
[35] Ans. and Countercl., **Ex. 7**.
[36] *Id.* at 7, ¶ 9.
[37] *Id.* at 19, ¶ 28.
[38] *Id.* at 19–20, ¶¶ 29, 37–38.
[39] Compl. ¶ 7.

**EXHIBITS TO DELTA'S MOTION TO DISMISS**

In support of this motion to dismiss, Delta submits two types of documents this Court may consider without converting this to a summary judgment motion.

*First*, this Court may consider the relevant contracts, the SPD, and CA's Notice of Material Breach Letter. A court may consider a document referenced in the complaint even if it is not attached thereto "under the incorporation-by-reference doctrine if the document is (1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged."[40] CA's copyright action is based on its erroneous interpretation of the relevant contracts, which the Complaint identifies by name and relies upon to support its claims.[41] The Complaint also invokes the SPD—which Delta neither accepted nor agreed to as part of the final contract documents—and references CA's Notice of Material Breach letter, in which CA imposed an "█████████" that Delta refused to pay.[42] The authenticity of these documents is not in dispute. Thus, this Court may consider these documents in resolving this motion to dismiss.[43]

---

[40] *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024).

[41] *See, e.g.*, Compl. ¶¶ 17–19 (Master Agreement); *id.* ¶ 22 (2023 Order Form); *id.* ¶¶ 29–30 (Kyndryl Contract and SOW); *id.* ¶ 31 (2024 Order Form).

[42] *Id.* ¶¶ 25, 37; Ex. 6 at 5.

[43] *See, e.g.*, *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 (11th Cir. 2005) (holding that the district court properly considered a contract that was "central to the plaintiff's claims and is undisputed in terms of authenticity"); *Alticor Inc. v. UMG Recordings, Inc.*, 6:14-CV-542-ORL-37-DAB, 2014 WL

*Second*, Delta requests judicial notice of CA's Answer and Counterclaim filed in Gwinnett County. Under Federal Rule of Evidence 201, this Court "must take judicial notice" of certain facts "if a party requests it and the court is supplied with the necessary information."[44] This Rule authorizes judicial notice of facts that can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned."[45] That includes pleadings like CA's Answer and Counterclaims in the Gwinnett County action, "which [are] public records."[46]

To be clear, Delta requests judicial notice not to establish the truth of the allegations in these pleadings but simply to establish that CA made them. In particular, Delta asks this Court to take judicial notice of (a) CA's admission that it had not terminated the Master Agreement or any Order Form and (b) CA's assertion of a breach of contract claim based on the same allegations at issue here.

## ARGUMENT AND CITATION TO AUTHORITY

I.    **CA's claims are breach of contract claims masquerading as a copyright action.**

Although CA brought this action to assert a federal copyright claim, it has not asserted any violation of its exclusive rights under the Copyright Act, as it must

---

12873476, at *2 (M.D. Fla. July 18, 2014) (considering a license agreement in a copyright action under the incorporation-by-reference doctrine).

[44] Fed. R. Evid. 201(c)(2).

[45] Fed. R. Evid. 201(b); *see, e.g.*, *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999).

[46] *Horne v. Potter*, 392 F. App'x 800, 802 (11th Cir. 2010).

to support a copyright infringement claim. The Copyright Act provides that

"[a]nyone who violates any of the exclusive rights of the copyright owner as

provided by [17 U.S.C. § 106] … is an infringer of the copyright."[47] Section 106,

in turn, enumerates the six exclusive rights that a copyright holder enjoys.[48] Rights

four through six relate to works of art or sound and thus are irrelevant here. The

remaining rights the Act grants to CA relating to its DX NetOps software include

the exclusive rights:

> (1) to reproduce the copyrighted work in copies or phonorecords;
> (2) to prepare derivative works based upon the copyrighted work; [and]
> (3) to distribute copies or phonorecords of the copyrighted work to the
> public by sale or other transfer of ownership, or by rental, lease, or
> lending.[49]

The Eleventh Circuit sums this up in *Lipscher v. LRP Publications, Inc.*, stating

that "[t]he exclusive rights under the Copyright Act include the right to reproduce

the copyrighted work, to prepare derivative works, and to distribute copies to the

public."[50]

A copyright holder may license its copyrighted work to a licensee, and the

contracting parties can set the terms for that contract. "When copyright holders

---

[47] 17 U.S.C. § 501(a). The exclusive rights of a copyright holder also include rights
under 17 U.S.C. § 106A, but those deal with visual art and thus don't apply here.
Section 501(a) also cites 17 U.S.C. §§ 107–122, but those provisions set
limitations on copyright holders' exclusive rights.
[48] 17 U.S.C. § 106.
[49] *Id.*
[50] 266 F.3d 1305, 1311 (11th Cir. 2001) (citing 17 U.S.C. § 106).

agree to license their products in exchange for a fee," the Eleventh Circuit explained in *MCA Television Ltd. v. Public Interest Corp.*, "they have entered the realm of legally enforceable contracts, and have represented as much to their contractual counterparts."[51] A violation of the parties' contractual terms may, but does not necessarily, trigger copyright infringement.[52]

To determine whether a breach of a license agreement is a garden-variety breach of contract or copyright infringement in violation of federal law, courts ask two questions. *First*, courts ask whether the provision allegedly breached was (a) a "condition precedent" to the licensee's rights to copy or distribute the work or, instead, (b) "merely a covenant," the breach of which implicates rights granted only under the contract.[53] *Second*, courts ask whether the rights at issue are grounded in any of the exclusive rights the Copyright Act grants. If not, then the copyright holder is seeking to vindicate rights under the contract and can bring only a breach of contract claim. Delta takes each of these questions in turn.

### A. The Authorized Use Limitation is not a condition on Delta's use of copies of the DX NetOps software.

The Master Agreement does not condition Delta's authority to use the DX NetOps software on Delta staying within the Authorized Use Limitation. State law

---

[51] 171 F.3d 1265, 1275 (11th Cir. 1999).
[52] *Fantastic Fakes, Inc. v. Pickwick Int'l, Inc.*, 661 F.2d 479, 483 (5th Cir. 1981).
[53] *Id.*; *see also* O.C.G.A. § 13-3-4 ("[A] condition precedent … must be performed before the contract becomes absolute and obligatory upon the other party.").

governs whether a term is a condition precedent.[54] Georgia law applies here because the contract was executed and performed in Georgia.[55]

Under Georgia law, conditions precedent are "not favored" and where possible, courts must construe contract language to avoid a condition precedent.[56] Generally, conditions precedent "are created by language such as 'on condition that,' 'if,' and 'provided,' or by explicit statements that certain events are to be construed as conditions precedent."[57] Thus, for example, the Eleventh Circuit held in *Fantastic Fakes Inc. v. Pickwick International, Inc.*, that a disputed provision in a license agreement lacking "words of condition" was not a condition precedent.[58]

Applying this principle in a very similar case, the court in *Yellowpages Photos, Inc. v. YP, LLC*, recently dismissed a copyright claim based on alleged violations of authorized use limitations.[59] There, plaintiff granted the defendant a license to use its copyrighted work but "limit[ed] the use of the license to 'no more than 48 employees.'"[60] When the defendant used the license with more employees, the plaintiff alleged that the defendant infringed the copyright because it acted

---

[54] *Fantastic Fakes*, 661 F.2d at 483.

[55] *See Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1444 (11th Cir. 1991).

[56] *Choate Constr. Co. v. Ideal Elec. Contractors, Inc.*, 541 S.E.2d 435, 438 (Ga. Ct. App. 2000) (internal quotation marks omitted).

[57] *Id.*

[58] 661 F.2d at 483.

[59] 418 F. Supp. 3d 1030, 1044 (M.D. Fla. 2019), *aff'd sub nom. Yellow Pages Photos, Inc. v. YP, LLC*, 856 F. App'x 846 (11th Cir. 2021).

[60] *Id.*

outside the scope of the license.[61] The court disagreed because there was "[n]o clear language in the … License establish[ing] that these provisions are conditions."[62] The plaintiff's only remedy, therefore, was under the contract.[63]

The same is true here. There is no language in the relevant contracts conditioning Delta's use of DX NetOps on Delta staying within the Authorized Use Limitation. Nor would it make sense to treat the Authorized Use Limitation as a condition precedent, because Delta's compliance or noncompliance with it occurs only after Delta begins using the license. In contrast, a condition precedent must occur "before performance under a contract becomes due."[64] Thus, even if CA's allegations of excessive use were all true (and they're not), such excessive use only gives rise to a contract claim, and not a copyright claim.

---

[61] *Id.*

[62] *Id.* at 1049.

[63] *Id.*; *see also Muench Photography, Inc. v. McGraw-Hill Glob. Educ. Holdings, LLC*, 367 F. Supp. 3d 82, 90 (S.D.N.Y. 2019) (holding that exceeding limits of use under a license agreement "is better understood as a violation of the provision prohibiting the Defendant from making, using or distributing copies of any Images for any purpose except as authorized," and not as a condition precedent (quoting *Sohm v. Scholastic, Inc.*, 16-CV-7098 (JPO), 2018 WL 1605214, at *13 (S.D.N.Y. Mar. 29, 2018), *aff'd in part, rev'd in part and remanded*, 959 F.3d 39 (2d Cir. 2020)) (cleaned up). The court in *Muench* agreed that a limitation on the "specific use" of certain images "merely delineat[ed] acceptable and unacceptable behavior under the licensing agreement and therefore a covenant." 367 F. Supp. 3d at 89. (citing *Sohm*).

[64] *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 754 (11th Cir. 1997).

**B. The Authorized Use Limitation is not grounded in any of CA's exclusive rights under the Copyright Act.**

In any event. regardless of how CA characterizes the Authorized Use Limitation, that provision cannot enlarge CA's exclusive rights under the Copyright Act. But that's precisely what CA has tried to do here.

To restate, CA's exclusive rights under the statute—the only ones that can trigger statutory liability—are limited to the "right to reproduce the copyrighted work, to prepare derivative works, and to distribute copies to the public."[65] CA does not allege that Delta lacked the right to possess copies of the DX NetOps software it used to monitor devices on Delta's network. To the contrary, CA alleges and admits that it granted Delta a license to use copies of the DX NetOps software to monitor its network. Although the agreements limit the number of devices the software may monitor, they do not limit the number of copies Delta may use. And in any case, CA does not base its copyright claim on Delta's possession of unauthorized copies of the software. Nor does CA allege that Delta prepared derivative works of DX NetOps software or that Delta distributed copies of DX NetOps to the public. Thus, on their face, CA's allegations do not implicate any of CA's exclusive rights under the federal Copyright Act.

---

[65] *Lipscher,* 266 F.3d at 1311 (citing 17 U.S.C. § 106).

Instead, CA's theory is that its agreement with Delta limited Delta's use of the licensed copies of DX NetOps based on the volume of devices the software monitored. According to CA, Delta exceeded that Authorized Use Limitation. But because the alleged breach did not infringe on CA's exclusive rights under § 106, the breach simply cannot support a statutory copyright infringement claim.

The Supreme Court case of *Bobbs-Merrill Co. v. Straus* is instructive.[66] There, the Supreme Court held that a copyright holder can sue under the Copyright Act to vindicate only those rights the Act grants.[67] The plaintiff owned the copyright to the novel "The Castaway."[68] On the book's first page, the plaintiff inserted a notice that the "price of this book at retail is $1 net" and instructed that "[n]o dealer is licensed to sell it at a less price, and a sale at a less price will be treated as an infringement of the copyright."[69] After buying copies of the book from a wholesaler at a discount, the defendant sold the book for less than a dollar.[70]

Like CA, the plaintiff sued to vindicate its rights under the Copyright Act, arguing that its right to impose the price limitation "springs from the protection of the copyright law."[71] The plaintiff could not argue that its right sprung from a

---

[66] 210 U.S. 339 (1908).
[67] *Id.* at 350.
[68] *Id.* at 341.
[69] *Id.*
[70] *Id.* at 341–42.
[71] *Id.* at 343.

contract, because the plaintiff had no contract with the defendant.[72] Thus, the Court had to consider the "extent of the protection which is given by the copyright statutes of the United States to the owner of a copyright."[73]

On that score, the plaintiff lost because, once it sold the book, it had no remaining rights under the Act to control resale price of further distribution. The Court explained that the Act "protect[s] the owner of the copyright in his right to multiply and sell his production," but it does not grant any other rights "not included in the terms of the statute."[74] While the owner retained the right to prohibit copies of its work, the Act did not grant the right to control resale price after the book was first sold. This has been codified as the first-sale doctrine.[75]

To be sure, the first sale doctrine doesn't apply when an owner licenses its work, because in that scenario, the licensor retains the right under the Act to control downstream distribution. But the more basic principle of *Bobbs-Merrill*— that a copyright holder's claims under the Act can vindicate only those rights the Act grants—applies whether the holder is an owner or a licensor. Either way, *Bobbs-Merrill* teaches that a holder's claim under the Act must be tied to a right

---

[72] *See id.*
[73] *Id.* at 346.
[74] *Id.* at 350.
[75] 17 U.S.C. § 109(a).

"included in the terms of the statute."[76] Here, however, CA's claims spring not from the statute but solely from CA's contract with Delta.

The Federal Circuit's decision in *Storage Technology Corp. v. Custom Hardware Engineering & Consulting, Inc.* shows this principle in action. The court held that exceeding the scope of a license does not amount to copyright infringement unless "the source of the copyright owner's complaint [is] grounded in a right protected by the Copyright Act."[77] That case involved software "maintenance code," which—much like the software here—"diagnose[s] malfunctions" to "maintain performance" of certain devices.[78] And just as here, the license authorized the defendant to have copies of the maintenance code (which the defendant received along with the "functional" part of the software).[79] But the license "specifically exclude[d] the *use* of the maintenance" software from its scope.[80] The holder argued that the defendant's use of the maintenance software exceeded the scope of the license and thus amounted to copyright infringement.

The Federal Circuit disagreed, holding that, though a breach of such limitation might trigger contract liability, it did not implicate any of the plaintiff's

---

[76] 210 U.S. at 351.
[77] 421 F.3d 1307, 1316 (Fed. Cir. 2005).
[78] *Id.*
[79] *Id.* at 1310–11.
[80] *Id.* at 1315 (emphasis added).

exclusive rights under the statute.[81] The court explained that the rights under the

statute are limited, while "the rights granted by contract can be much broader."[82]

The court offered a hypothetical involving a license "to make one and only one

copy of a book with the caveat that the licensee may not read the last ten pages."[83]

"Obviously," the court explained, "a licensee who made a hundred copies of the

book would be liable for copyright infringement because the copying would violate

the Copyright Act's prohibition on reproduction and would exceed the scope of the

license."[84] In contrast, "if the licensee made a single copy of the book, but read the

last ten pages, the only cause of action would be for breach of contract, because

reading a work does not violate any right protected by copyright law."[85]

The Ninth Circuit relied on the same reasoning in *MDY Industries, LLC v.*

*Blizzard Entertainment, Inc.* to hold that "for a licensee's violation of a contract to

constitute copyright infringement, there must be a nexus between the condition and

the licensor's exclusive rights of copyright."[86] The plaintiff was the creator of a

video game called World of Warcraft.[87] In this role-playing game, players in a

virtual world participate in various quests, collecting rewards that players use to

---

[81] *Id.* at 1315–16.
[82] *Id.* at 1316.
[83] *Id.*
[84] *Id.*
[85] *Id.*
[86] 629 F.3d 928, 941 (9th Cir. 2010).
[87] *Id.* at 935.

buy and sell items in the game.[88] When a player purchases a license to use the

game, the player agrees to the terms of use, which prohibit players from using

"bots" (*i.e.*, robots that "automate[] play of WoW's early levels" to gain rewards).[89]

The defendant violated that term, and the plaintiff sued under the Copyright Act.

The Ninth Circuit recognized that the violation of the terms amounted to use

of the copyrighted work outside the scope of the license, but it held that such a

violation did not give rise to a copyright claim.[90] Instead, regardless of how the

license is worded, there can be a copyright claim only if the licensee "exceeds the

license's scope … *in a manner that implicates one of the licensor's exclusive*

*statutory rights*."[91] "Were we to hold otherwise," the court explained, "[the

plaintiff]—or any software copyright holder—could designate any disfavored

conduct during software use as copyright infringement, by purporting to condition

the license on the player's abstention from the disfavored conduct. … This would

allow software copyright owners far greater rights than Congress has generally

conferred on copyright owners."[92] The user in *MDY* was authorized to use a copy

---

[88] *Id.* at 938.

[89] *Id.* at 935.

[90] *Id.* at 939–40.

[91]*Id.* at 940 (emphasis added). The Ninth Circuit also construed the limitation as a covenant, not a condition. *Id.* at 939–40. But it explained that "contractual terms that limit a license's scope" are conditions, and it proceeded to analyze whether the alleged breach of the scope of the license triggered copyright liability. *Id.*

[92] *Id.* at 941.

of the software. And because the conduct (the use of bots in violation of the license) did not implicate any of the holder's exclusive rights, use outside the scope of the license could not trigger liability under the Copyright Act.[93]

The common thread in these cases goes back to the principle the Supreme Court recognized in *Bobbs-Merrill* that a copyright holder can sue under the Copyright Act only to vindicate rights the Act grants. CA's claims do not implicate any of those rights. In particular, CA does not claim that Delta made unsanctioned copies of the DX NetOps software. Just as in *Storage Tech*, "[t]he use of the [software] may violate the license agreement, but it is not forbidden by copyright law and thus cannot give rise to an action for copyright infringement."[94] CA's only recourse is to sue under the contract.

And in fact, that's exactly what CA is doing right now in Gwinnett County. CA brought a breach of contract claim against Delta alleging that Delta's failure to stay within the Authorized Use Limitations constitutes a "material breach[]" of the

---

[93] *Id.*; *see also Ticketmaster L.L.C. v. Prestige Ent., Inc.*, 306 F. Supp. 3d 1164, 1173–74 (C.D. Cal. 2018) (holding that a copyright holder failed to state a copyright claim because the license "condition" limiting "the amount of times [a licensee] may request pages of the Website, send ticket reservation requests, or refresh transactions" did not "implicate[] an exclusive right of copyright").
[94] 421 F.3d at 1316 (citing *United States Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 695 (2d Cir. 1991)). The Eleventh Circuit, which undoubtedly sees less copyright litigation than the Ninth or Federal Circuits, hasn't yet addressed whether a licensee who exceeds the scope of a license may be liable for infringement where the conduct implicates no rights under the Copyright Act.

contract.[95] CA alleges that it sent Delta an invoice to remedy this breach and that Delta failed to pay.[96] Although CA contends this failure triggered its right to terminate the license, CA confirmed it has not done so.[97] Thus, the license is still in effect, and CA's only remedy for alleged excessive use is one under the contract.

In sum, to the extent Delta has any liability here, it springs solely from the parties' contract and not under the Copyright Act. In the end, there is no federal case here and this Court should dismiss CA's copyright infringement claims.

## II. CA failed to state a copyright claim based on the license count methodology in the SPD to which Delta never agreed.

Even if a breach of the Authorized Use Limitations could trigger copyright liability, CA cannot state a claim based on contract terms Delta never accepted. But the primary focus of CA's Complaint does just that.

Both the Master Agreement and the Kyndryl Contract require that the parties confirm any changes in the licensing of CA software in a writing that is signed by the parties.[98] And while CA alleges that Delta violated the pricing terms imposed by the SPD, CA never alleges that the parties signed the SPD. Absent a signed writing agreeing to the license count methodology in the SPD, CA cannot state a claim premised on Delta's alleged failure to comply with the terms of the SPD.

---

[95] Ans. and Countercl. (Ex. 7) at 20, ¶ 38.
[96] *Id.* at 20, ¶¶ 36–37; Ex. 6 at 5.
[97] Ans. and Countercl. (Ex. 7) at 7, ¶ 9.
[98] Ex. 1 at 2; Ex. 4-A at 4; Ex. 4 at 58, § 27.9.

In its Complaint, CA raises two meritless arguments in its effort to hold Delta to the terms of the SPD despite the lack of a signed writing. *First*, CA says that the SPD is "publicly available on CA's website" and that CA "provided the [SPD] to Delta directly and emphasized the definition of 'Devices' contained therein."[99] Neither fact supplants the need for a signed writing, and CA alleges no facts suggesting otherwise.

*Second*, CA says that the Master Agreement defines its "Licensed Programs" to include "documentation," and thus, Delta is subject to any "documentation" relating to licensed software. But that's not what the Master Agreement says. Instead, it provides that "[w]hen CA accepts an Order Form, [Delta] will have, subject to the terms and conditions of this Agreement, a nontransferable and nonexclusive license to use the Program Product(s), optional features, if any, and related materials (collectively the 'Licensed Program') *described in the Order Form(s) referencing this Agreement*."[100] Thus, the Master Agreement contemplates, at most, that only where "related materials" are "described" in the Order Form could those terms become part of the license. Again, CA's Complaint identifies no Order Form that describes or even references the SPD.

---

[99] Compl. ¶ 4.
[100] Ex. 1 at 2 (emphasis added).

Moreover, CA's reading of the Master Agreement would eliminate the signed writing requirement, allowing CA to modify the terms of any Order Form simply by releasing "documentation" via its website or unilaterally sending "documentation" to its licensees. Such a construction would violate the rule that any interpretation of a contract should "uphold the contract as a whole and not make any provision meaningless."[101] It also would give CA the right to foist terms on its licensees without the licensee's assent, a basic element of any contract.

CA's argument also ignores the Kyndryl Contract. Under that agreement, for any document to become part of the Kyndryl Contract, such document must reference the Kyndryl Contract.[102] The SPD fails to do that. Thus, under the plain terms of the Kyndryl Contract, the SPD was never incorporated into that agreement or the Kyndryl SOW. Delta is thus not subject to the additional terms of the SPD.

One court in this Circuit recently reached a similar conclusion in *Infogroup Inc. v. Office Depot, Inc.*[103] Just as here, the plaintiff in *Infogroup* alleged that the defendant exceeded the scope of a licensing agreement.[104] But the court rejected

---

[101] *Dohn v. Dohn*, 584 S.E.2d 250, 252 (Ga. 2003) (internal quotation marks omitted); *see, e.g.*, *Bellsouth Telecomms., Inc. v. Nuvox Commc'ns, Inc.*, 1:04-CV-2790-WSD, 2006 WL 2617123, at *20 (N.D. Ga. Sept. 12, 2006) (applying Georgia canons of construction); *Canon USA, Inc. v. Norfolk S. Ry. Co.*, 936 F. Supp. 968, 973 (N.D. Ga. 1996) (rejecting a construction of a contractual provision that would render other provisions meaningless).

[102] Ex. 4-A at 3; Ex. 4 at 6, § 1.4.1.

[103] 688 F. Supp. 3d 1179, 1184 (S.D. Fla. 2023).

[104] *Id.* at 1181.

the plaintiff's construction of the licensing agreement and held that the agreement did not impose the terms the plaintiff advanced.[105] Accordingly, the court dismissed the copyright infringement claim.[106]

The result should be the same here under the requirements to plead a breach of contract in federal court: if a plaintiff does "not present any allegations or evidence that such a provision was included or meant to be included in the written agreements," it cannot sue based on a breach of such provision.[107] Because CA alleges no facts to render plausible its contention that Delta was subject to the SPD's additional terms that are critical to its claims, this Court should dismiss the claims based on those terms.

## CONCLUSION

CA's claims are not tethered to any of the exclusive rights CA has under the Copyright Act. That's because CA's claims arise solely under contract. Thus, CA's only option is to sue under the contract, which CA is doing in Gwinnett County. This Court should, therefore, dismiss this action for failure to state a claim under the Copyright Act. If this Court allows this action to proceed, it should at least dismiss the claims premised on terms to which Delta never agreed.

---

[105] *Id.* at 1184–85.

[106] *Id.* at 1185.

[107] *IOTC Air, LLC v. Bombardier Inc.*,  No. 11-22861-CIV, 2012 WL 13013072, at *6 (S.D. Fla. Mar. 23, 2012).

Respectfully submitted this 27th day of March, 2025.

*/s/ Michael R. Baumrind*
Ronan P. Doherty
Georgia Bar No. 224885
Michael R. Baumrind
Georgia Bar No. 960296
**BONDURANT MIXSON & ELMORE, LLP**
1201 West Peachtree Street NW
Suite 3900
Atlanta, Georgia 30309
(404) 881-4100
doherty@bmelaw.com
baumrind@bmelaw.com

*Attorneys for Defendant Delta Air Lines, Inc.*

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically filed the within and foregoing **DELTA AIR LINES, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS** with the Clerk of Corut using the CM/ECF system, which will automatically send e-mail notification of such filing to all attorneys of record.

This 27th day of March, 2025.

/s/ Michael R. Baumrind
Michael R. Baumrind
Georgia Bar No. 960296