**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**

CA, INC. d/b/a CA TECHNOLOGIES
(A BROADCOM COMPANY), a
Delaware corporation,

        Plaintiff,

      v.

DELTA AIR LINES, INC.,

        Defendant.

Civil Action No. 1:25-CV-00489-TCB

## CA, INC.'S OPPOSITION TO
## DELTA AIR LINES, INC.'S MOTION TO DISMISS

## TABLE OF CONTENTS

                                                                    Page

INTRODUCTION ................................................................................ 1

RELEVANT BACKGROUND .......................................................... 4

ARGUMENT ...................................................................................... 7

    I.      CA states a plausible claim for copyright infringement based on Delta's unauthorized use of CA's copyrighted software ...................................................................................... 7

         A.    The existence of a license agreement does not preclude CA from claiming that Delta's unauthorized use of CA's software infringes CA's copyrights................................................................. 8

         B.    Delta's unauthorized use of CA's software violates CA's exclusive rights under the Copyright Act..................... 17

    II.    Delta's factual dispute that it never agreed to certain contract terms cannot support dismissal of CA's Complaint ........................................................................ 20

CONCLUSION ................................................................................ 25

<u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>Cases</u>

*Amin v. Mercedes-Benz USA, LLC*,
349 F. Supp. 3d 1338 (N.D. Ga. 2018)................................................................23

*Atkins v. Fischer*,
331 F.3d 988 (D.C. Cir. 2003) ...............................................................................9

*Audio Sys. of Fla., Inc. v. Simplexgrinnell LP*,
2003 WL 22830002 n.3 (M.D. Fla. July 14, 2003) ............................................18

*BioHealth Med. Lab., Inc. v. Cigna Health & Life Ins. Co.*,
706 F. App'x 521 (11th Cir. 2017) ........................................................ 16, 22, 25

*Blue Ridge Apartment Co. v. Telfair Stockton & Co.*,
54 S.E.2d 608 (Ga. 1949)......................................................................................15

*Bobbs-Merrill Co. v. Straus*,
210 U.S. 339 (1908)................................................................................................19

*CBS,Inc. v. PrimeTime 24 JointVenture*,
76 F. Supp. 2d 1333 (S.D. Fla. 1998) ..................................................................10

*CMAX/Cleveland,Inc. v. UCR, Inc.*,
804 F. Supp. 337 (M.D. Ga. 1992) ......................................................................10

*Elektra Entm't Grp., Inc. v. Barker*,
551 F. Supp. 2d 234 (S.D.N.Y. 2008) ..................................................................18

*Fantastic Fakes, Inc. v. Pickwick Int'l, Inc.*,
661 F.2d 479 (5th Cir. 1981) ........................................................................ 12, 16

*GlobalOptions Servs., Inc. v. N. Am. Training Grp., Inc.*,
131 F. Supp. 3d 1291 (M.D. Fla. 2015)................................................................18

*Horsley v. Feldt*,
304 F.3d 1125 (11th Cir. 2002) .................................................................... 23, 25

Infogroup In*c. v. Off. Depot, Inc.*,
*688 F. S*upp. 3d 1179 (S.D. Fla. 2023)..................................................................22

TABLE OF AUTHORITIES
(continued)

Page(s)

*Jacob Maxwell, Inc. v. Veeck,*
110 F.3d 749 (11th Cir. 1997) ....................................................................... 12, 16

*Latimer v. Roaring Toyz, Inc.,*
601 F.3d 1224 (11th Cir. 2010) ................................................................. 7, 11, 12

*Live Face on Web, LLC v. Emerson Cleaners, Inc.,*
66 F. Supp. 3d 551 (D.N.J. 2014) ...............................................................18

*Live Face on Web, LLC v. The Control Grp. Media Co.,*
150 F. Supp. 3d 489 (E.D. Pa. 2015) ........................................................ 7, 9, 10

*Maxcess, Inc. v. Lucent Techs., Inc.,*
433 F.3d 1337 (11th Cir. 2005) .............................................................14

*MCA Television Ltd. v. Public Int. Corp.,*
171 F.3d 1265 (11th Cir. 1999) ........................................................... 9, 12, 17

*MDY Indus., LLC v. Blizzard Ent., Inc.,*
629 F.3d 928 (9th Cir. 2010) ..............................................................19

*Michael Grecco Prods., Inc. v. RGB Ventures, LLC,*
2017 WL 4077045 (M.D. Fla. Sept. 14, 2017)....................................... 7, 10, 11

*Muench Photography, Inc. v. McGraw-Hill Glob. Educ. Holdings, LLC,*
367 F. Supp. 3d 82 (S.D.N.Y. 2019) ....................................................16

*S.O.S., Inc. v. Payday, Inc.,*
886 F.2d 1081 (9th Cir. 1989) ...............................................................9

*Sohm v. Scholastic Inc.,*
959 F.3d 39 (2d Cir. 2020)...................................................................15

*Storage Technology Corp. v. Custom Hardware Engineering & Consulting, Inc.,*
421 F.3d 1307 (Fed. Cir. 2005)..............................................................19

*SwissWatchExpo, Inc. v. Buyer's Best Bet, Inc.,*
2021 WL 12300167 (N.D. Ga., Sept. 29, 2021)....................................8

*Ticketmaster L.L.C. v. Prestige Ent., Inc.,*
306 F. Supp. 3d 1164 (C.D. Cal. 2018) ................................................19

TABLE OF AUTHORITIES
(continued)

Page(s)

*Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*,
  924 F.3d 32 (2d Cir. 2019)..................................................................................9

*Yellowpages Photos, Inc. v. YP, LLC*,
  418 F. Supp. 3d 1030 (M.D. Fla. 2019)...........................................................15

**Statutes**

17 U.S.C.A. § 106 ...............................................................................................17

**Other Authorities**

LR 5.....................................................................................................................28

## INTRODUCTION

This case arises from Delta Air Lines, Inc.'s willful violation of CA, Inc.'s intellectual property rights. For several years, CA has granted a non-exclusive license to Delta that allows Delta to use CA's proprietary software called DX NetOps. That license, however, is limited. Delta is permitted to use CA's software only on a certain number of devices on Delta's network. Any additional use would be wholly unlicensed. Delta has continuously engaged in such unlicensed use since at least early 2023 by deploying CA's software to monitor thousands of unauthorized devices and reproducing CA's copyrighted material in the process, violating CA's exclusive rights under the Copyright Act.

When CA confronted Delta about its violation of CA's intellectual property rights, Delta denied all wrongdoing and refused to halt its misconduct. Delta instead tried to preempt CA's claims by rushing to Georgia state court, where it filed its own lawsuit baselessly accusing CA of breaching the parties' agreements. CA, however, is entitled to its day in court. CA thus filed this lawsuit to vindicate its rights under the Copyright Act and hold Delta accountable for its willful infringement of CA's intellectual property.

Delta now asks this Court to dismiss CA's lawsuit. Delta makes three main arguments for dismissal: (i) CA's only remedy for Delta's misuse of CA's copyrighted material is to pursue a breach of contract claim; (ii) CA has not

alleged that Delta infringes any of CA's exclusive rights under the Copyright Act; and (iii) Delta is not bound by the documentation that was expressly incorporated into the parties' agreements and provided to Delta before it obtained CA's copyrighted material.  All three arguments fail.

*First*, Delta's license to use CA's copyrighted software does not absolve Delta of liability for copyright infringement when it exceeds the scope of that license.  The Eleventh Circuit has long held that the protections of the Copyright Act apply when a licensee uses copyrighted material in ways that exceed the scope of its license.  That is what CA alleges in its Complaint: Delta willfully exceeded the limits of its license by using CA's copyrighted software on thousands of unauthorized devices.  The Copyright Act does not allow such misconduct.  Nor can Delta escape liability for copyright infringement by recasting CA's claim as one sounding in contract.  The analytical framework Delta employs in its Motion— determining whether the relevant limitation in Delta's license agreement is a condition or a covenant—does not apply here.  Even if it did, the license agreement's limitation of Delta's use of CA's copyrighted software to a certain number of devices is a condition of the license, not a covenant, entitling CA to pursue its copyright infringement claim against Delta.

*Second*, Delta's misuse of CA's copyrighted software infringes CA's exclusive rights enshrined in the Copyright Act.  As Delta acknowledges, that Act

prohibits others from reproducing CA's copyrighted material without permission. That is precisely what Delta has done. By using CA's copyrighted software on thousands of unauthorized devices, Delta reproduced CA's copyrighted material without permission. Reproducing its software is CA's exclusive right—a right that Delta has willfully violated and that CA is entitled to vindicate.

*Third*, Delta's contention that it is not bound by the documentation incorporated into the parties' agreements is at odds with CA's allegations (which the Court must accept as true on this Motion), the text of the contracts themselves, and common sense. The plain language of the parties' agreements makes clear that Delta's license agreement authorized it to use CA's copyrighted software only on a limited number of "devices." The documentation providing the methodology for determining the number of licenses required to stay within those limits was expressly incorporated into the parties' agreements. Tellingly, Delta has never explained how it would determine whether it was abiding by the "Authorized Use Limitations" *without* referring to the documentation applicable for the relevant software. It could not. Delta thus knew full well that its use of CA's software on thousands of additional devices was not authorized by its license agreement. At any rate, CA alleges that Delta's use exceeded the "Authorized Use Limitations" even excluding the requirements to which Delta now objects. Thus, Delta infringed CA's copyrights whether or not the documentation in question applies.

Delta's factual disputes regarding contract formation and interpretation are improper at this stage and must be disregarded.

In short, CA's Complaint states a viable claim for copyright infringement. Delta's Motion should therefore be denied.

## RELEVANT BACKGROUND

CA is a technology company that creates and markets software solutions for customers throughout the United States.  Compl. ¶ 14.  CA has spent decades developing its product portfolio and protects the value of that portfolio through, among other things, vigorous enforcement of its intellectual property rights.  *Id.* ¶¶ 15, 17.  Such enforcement of CA's intellectual property rights is crucial because CA's products face stiff competition in the marketplace.  *See id.* ¶ 15.

Much of CA's revenue derives from licensing its products, maintaining those products, and supporting its licensees' use of the products.  *Id.* ¶ 16.  To ensure CA is appropriately compensated for that use, CA's contracts limit the permissible use those licensees may make of CA's products.  *Id.* ¶ 16.

Delta is one of CA's licensees.  *Id.* ¶ 17.  Thirty-six years ago, CA and Delta entered into a master license agreement (the "Master License Agreement").  *Id.* Under the Master License Agreement, when "CA accepts an Order Form" placed by Delta, Delta will be granted "a nontransferable and nonexclusive license to use" the "Licensed Program" that is "described in the Order Form(s)."  *Id.* ¶ 18.  The

definition of "Licensed Program" includes "all … code, documentation, [ ] materials, and enhancements" that "embody[] or relate[] to the Licensed Program." *Id.* ¶ 19.  Delta's right to use the Licensed Program is not absolute, but is "subject to the terms and conditions of th[e]" Master License Agreement.  *Id.* ¶ 18.

In January 2023, CA accepted an order form placed by Delta (the "2023 Order Form").  *Id.* ¶ 22.  That 2023 Order Form granted Delta a license to use CA's DX NetOps software with the SKU DXNOP2990 for one year, subject to certain "Authorized Use Limitations."  *Id.*   Under the 2023 Order Form, the Authorized Use Limitations prohibited Delta from using DX NetOps on more than 9,431 "Devices."  *Id.* ¶ 24.

Delta obtained additional licenses for the DX NetOps software in 2023 by placing an order through Kyndryl, Inc., a CA partner.  *Id.* ¶ 29.  Kyndryl operates as a middleman—Kyndryl purchased DXNOP2990 licenses from CA, and Delta obtained those licenses from Kyndryl.  *Id.*  Those licenses permitted Delta to use the DXNOP2990 software for four years, and prohibited Delta from using the software on more than 23,856 "Devices."  *Id.*

Before CA accepted the 2023 Order Form or the Kyndryl order, CA provided Delta with a document called Specific Program Documentation ("SPD"). *Id.* ¶ 25.  The SPD set forth more terms and conditions that applied to Delta's licenses of the DX NetOps software.  As relevant here, the SPD provided that

Delta needed one CA license for every ten "Pingable" Devices. *Id.* ¶ 27. After CA provided the SPD to Delta, Delta executed the 2023 Order Form and the Kyndryl Contract. *See id.* ¶¶ 25, 29–30.

CA accepted another order form from Delta in January 2024 (the "2024 Order Form"). *Id.* ¶ 31. The 2024 Order Form renewed Delta's license for DXNOP2990 for another year, and again limited Delta's use of that software to a maximum of 9,431 "Devices." *Id.*

Delta vastly exceeded the Authorized Use Limitations throughout 2023 and 2024. CA first became aware of Delta's unauthorized use in January 2024 after reviewing a telemetry report that reflected the extent of Delta's use of CA's software. *Id.* ¶ 33. Further analysis revealed that Delta had been using CA's software on more than 14,000 unauthorized devices. *Id.* ¶ 35. Importantly, Delta had exceeded its Authorized Use Limitations even excluding the requirement that it needed one CA license for every ten "Pingable" Devices. *Id.* ¶ 36.

Several months later, CA sent Delta a letter notifying Delta that its unauthorized use of CA's software constituted copyright infringement and breach of the relevant agreements. *Id.* ¶ 37. Delta never explained why it had exceeded the Authorized Use Limitations and refused to compensate CA for its unauthorized use of CA's software. *See id.* ¶ 38. Delta then rushed to the courthouse, filing a lawsuit in Georgia state court alleging that CA had breached the relevant

agreements.  CA disputes those allegations and has asserted counterclaims for breach of contract against Delta in that action.

Delta's misconduct, however, goes beyond mere breach of contract.  As CA noted in its affirmative defenses to Delta's breach of contract claim, Delta's unauthorized (and unlicensed) use of the DX NetOps software also infringes CA's valuable copyrights in that software.  CA thus filed this lawsuit to hold Delta accountable for its misconduct and remedy the harm caused to CA by Delta's willful and ongoing copyright infringement.[1]

## ARGUMENT

### I.  CA states a plausible claim for copyright infringement based on Delta's unauthorized use of CA's copyrighted software.

To state a viable claim for copyright infringement, CA need only plausibly allege two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *E.g.*, *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1232–33 (11th Cir. 2010).

Delta does not contend that CA failed to plausibly allege the first element.  *See generally* Dkt. 14-1.  Nor could it.  CA alleges that it "is the registered owner

---

[1] CA's assertion of breach of contract counterclaims in Delta's state suit do not undermine or waive CA's copyright infringement claims in this action.  Courts regularly permit copyright infringement and breach of contract claims to proceed in parallel where, as here, the defendant's conduct exceeded the scope of a license.  *See, e.g.*, *Live Face on Web, LLC v. The Control Grp. Media Co.*, 150 F. Supp. 3d 489, 498, 501 (E.D. Pa. 2015) (denying motion to dismiss parallel copyright infringement and breach of contract claims); *Michael Grecco Prods., Inc. v. RGB Ventures, LLC*, 2017 WL 4077045, at *7, 11 (M.D. Fla. Sept. 14, 2017) (same).

of the valid and exclusive copyrights … for CA's DX NetOps software," and CA identified the relevant copyright registrations in Exhibit A to the Complaint.  *See* Compl. ¶ 40; Dkt. 1-1.  Those allegations suffice to establish the first element of an infringement claim at this stage.  *See, e.g.*, *SwissWatchExpo, Inc. v. Buyer's Best Bet, Inc.*, 2021 WL 12300167, at *6 (N.D. Ga., Sept. 29, 2021) ("At the motion to dismiss stage, an allegation of ownership of the copyright at issue alongside proper registration is enough to satisfy the first prong.").

Delta instead focuses its Motion on the second element, advancing two arguments.  *First*, Delta argues that the license agreement between Delta and CA absolves Delta of liability for copyright infringement and limits CA to claiming breach of contract.  Dkt. 14-1 at 12–14.  *Second*, Delta asserts that its unauthorized use of CA's copyrighted software does not violate "CA's exclusive rights under the" Copyright Act.  *Id.* at 15–22.  These arguments fail.

### A.    The existence of a license agreement does not preclude CA from claiming that Delta's unauthorized use of CA's software infringes CA's copyrights.

Delta contends that its unauthorized use of the DX NetOps software cannot constitute copyright infringement because Delta had "a license to use copies of the DX NetOps software to monitor its network."  *Id.* at 15.  Not so.

Even when a copyright owner licenses its copyrighted work to others, "copyright protections remain in the background to ensure that licensees do not use

materials in ways that exceed the scope of their licenses." *MCA Television Ltd. v. Public Int. Corp.*, 171 F.3d 1265, 1275 (11th Cir. 1999). Put simply, "a licensee infringes the owner's copyright if its use exceeds the scope of its license." *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 44 (2d Cir. 2019); *see also, e.g.*, *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1087 (9th Cir. 1989) ("A licensee infringes the owner's copyright if its use exceeds the scope of its license."); *Atkins v. Fischer*, 331 F.3d 988, 992 (D.C. Cir. 2003) ("[T]he licensor can still bring suit for copyright infringement if the licensee's use goes beyond the scope of the nonexclusive license.").

Many courts have applied this principle to allow a copyright infringement claim to proceed when it is based on allegations that a licensee exceeded the scope of a license. For instance, *Live Face on Web* is instructive. Like CA did here, the plaintiff in that case licensed its copyrighted software to the defendant. 150 F. Supp. 3d at 493–94. That license agreement restricted the defendant's use of the software "on only one URL." *Id.* at 493. After the plaintiff discovered that the defendant used the software "on two or more URLs in violation of the" license agreement, the plaintiff sued the defendant for copyright infringement. *Id. at* 494. Just as Delta argues in its Motion, the defendant in *Live Face on Web* argued that the plaintiff failed to state a claim for copyright infringement because the plaintiff had "granted a nonexclusive license to use" the copyrighted work to the defendant.

*Id.* at 497.  The court rejected that argument.  Applying the well-established principle that a "licensor can still bring suit for copyright infringement if the licensee's use goes beyond the scope of the nonexclusive license," the court concluded that the plaintiff's allegations that the defendant used the software "on websites outside the scope of the" license agreement sufficed to "state[] a claim for direct copyright infringement."  *Id.* at 498.

Courts in this Circuit have applied that same principle.  For example, the court in *CMAX/Cleveland, Inc. v. UCR, Inc.* found that the defendant "infringed [the plaintiff's] copyrights in and to" its software product despite the presence of a license agreement because a "licensee infringes [an] owner's copyright if [the] licensee's use exceeds [the] scope."  804 F. Supp. 337, 356–57 (M.D. Ga. 1992).

The court in *CBS, Inc. v. PrimeTime 24 Joint Venture* similarly recognized as "well settled" the notion "that federal copyright law jurisdiction exists where a copyright owner claims that a licensee exceeded the scope of its license."  76 F. Supp. 2d 1333, 1337 (S.D. Fla. 1998).  That court denied the defendant's motion to dismiss because the plaintiffs alleged that the defendant "exceeded its authority" to use the copyrighted material under the applicable license agreement.  *Id.* at 1338.

The court in *Michael Grecco Productions* reached a similar conclusion. That court acknowledged the principle that "a copyright owner may bring a claim for infringement against a licensee whose actions exceed the scope of the license."

2017 WL 4077045, at *5.  The plaintiff thus "state[d] a claim for direct copyright infringement" by alleging that the defendant "exceeded the scope of its license by distributing copyrighted images to an unauthorized distributor."  *Id.* at *7.

The Eleventh Circuit itself has also recognized this principle, holding that "a defendant who exceeds the scope of an implied license [to use a copyrighted work] commits copyright infringement."  *Latimer*, 601 F.3d at 1235.  Applying that principle, the court held that the plaintiff's copyright infringement claim "must be resolved by a jury" because the defendant may have "exceeded the scope" of its license.  *Id.* at 1237–38.[2]

The principle underlying all these cases compels denial of Delta's Motion.  Although Delta had a license to use DX NetOps, the license restricted Delta's use to a limited number of devices.  Compl. ¶¶ 24–32.  CA alleges that Delta willfully exceeded that limit, using CA's software on more than 14,800 unauthorized devices.  *Id.* ¶ 35.  CA also alleges that Delta "continues to willfully infringe CA's copyrights by deploying CA's DX NetOps software beyond the scope of the relevant license agreements."  *Id.* ¶ 38.  Given these allegations, Delta's argument that CA lacks a remedy in copyright law rings hollow and must be rejected.

---

[2] Delta apparently overlooked *Latimer* when it stated the Eleventh Circuit "hasn't yet addressed" this issue.  Dkt. 14-1 at 21 n.94.

Delta contends that CA's copyright infringement claim is viable only if the license agreement's restriction on Delta's use of CA's software is a "condition" of the license, rather than a contractual "covenant." Dkt. 14-1 at 12–14. In Delta's view, that restriction is only a "covenant," so Delta's violation of the restriction cannot support an infringement claim. *Id.* This argument also fails.

The Eleventh Circuit has never adopted or applied this condition-or-covenant analytical framework to a copyright infringement claim where the defendant exceeded the scope of a license.[3] The Eleventh Circuit has instead held that a copyright owner can assert a copyright infringement claim whenever a licensee "exceeds the scope" of the license—full stop. *Latimer*, 601 F.3d at 1235; *MCA Television*, 171 F.3d at 1275 ("[C]opyright protections … ensure that licensees do not use materials in ways that exceed the scope of their licenses.").

This rule makes sense. It ensures that copyright owners can pursue all available remedies—including enhanced damages or injunctive relief—to stop others from infringing their intellectual property. If this were not the rule,

---

[3] The only copyright case in which the Eleventh Circuit has used condition-or-covenant language, *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749 (11th Cir. 1997), involved a licensee's failure to pay for use that was indisputably licensed. *See id.* at 753–54. The court held that, because the defendant "*never played the song without permission*," it was "not liable for copyright infringement." *Id.* (emphasis added). That is far different than Delta's wholly unlicensed misuse of CA's copyrighted material. *Fantastic Fakes, Inc. v. Pickwick Int'l, Inc.*, 661 F.2d 479 (5th Cir. 1981), a Fifth Circuit case Delta relies on, is even less relevant, as that case concerns a defendant's failure to fulfill a tangential promise to "place the notice of [the plaintiff's] copyright" on each recording, rather than a licensee's use of copyrighted material for which a defendant has failed to purchase a license. *Id.* at 483.

infringers with a license agreement would have an incentive to exceed the scope of the license so long as the infringer could use the copyrighted material to generate revenue that exceeds the infringer's potential liability for ordinary breach-of-contract damages.  Put another way, unless a plaintiff can assert a copyright infringement claim when a licensee exceeds the scope of the license, the licensee could eviscerate the plaintiff's rights under copyright law by paying only expectation damages.  That is not, and should not be, the law.

Eviscerating CA's copyright rights is precisely what Delta is doing here. Through the Master License Agreement, CA authorized Delta to use and copy CA's copyrighted material on a limited number of devices.  Compl. ¶¶ 24–32. Despite that restriction, Delta has chosen to willfully exceed the limitations on its use of CA's software, presumably because it derives substantial benefit by doing so.  *Id.* ¶ 23.  Under governing law, CA is entitled to vindicate its intellectual property rights—and seek all attendant remedies—to end and disincentivize Delta's unlicensed use of CA's software.  Delta's attempt to impose an additional hurdle to pleading a viable copyright infringement claim should be rejected.

Even if the condition-or-covenant framework does apply here, the language in the parties' agreements makes clear that the "Authorized Use Limitations" are a condition rather than a mere covenant.  Both the 2023 and 2024 Order Forms were subject to "Authorized Use Limitations." Dkt. 14-3, 14-4.  The 2024 Order Form

provided that the "use of these CA Offerings are governed by the terms and *conditions* of this Order and the Master License Agreement … as amended."  Dkt. 14-4 at 1 (emphasis added).  The 2023 Order Form likewise provides that the license to use DXNOP2990 is "subject to the CA Agreement and this Order."  Dkt. 14-3 at 3.  Beyond the facially conditional nature of the term "Authorized Use Limitation," an amendment to the Master License Agreement states under the heading "Authorized Use": "The Licensed Programs may be used only by and for the benefit of [Delta] … provided that (i) [Delta] agrees to comply with the … usage restrictions of this Agreement[.]"  Ex.[4] 1 § 3.  Moreover, the parties' Master License Agreement only grants Delta a license to use the Licensed Program "*subject to* the terms and *conditions* of this Agreement," which is defined to include the "Order Form(s)."  Dkt. 14-2 at 1 (emphasis added); *see also id.* (Licensee will not "make copies of or reproduce any part of the Licensed Program in any form without the prior written consent of CA").  And, finally, the Documentation for DXNOP2990, which was incorporated by reference to the "Licensed Program" in the Order Forms between CA and Delta, states that the software was being provided only "under the following terms and conditions," including the definition of Devices.  Compl. ¶ 26.  Courts routinely hold that

---

[4] "Ex." citations refer to the exhibits to the CA, Inc.'s Opposition to Delta Air Lines, Inc.'s Motion to Dismiss.  The Court may judicially notice these exhibits because they are "central" to CA's claims and are "undisputed in terms of authenticity." *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 (11th Cir. 2005).

"[l]inguistic conventions" such as "subject to" constitute a condition precedent. *Sohm v. Scholastic Inc.*, 959 F.3d 39, 46 (2d Cir. 2020); *Blue Ridge Apartment Co. v. Telfair Stockton & Co.*, 54 S.E.2d 608, 614–13 (Ga. 1949) ("The words, 'subject, however, to,' created a condition precedent.").

In any event, whether the Authorized Use Limitation is a covenant or condition is not an issue that is typically resolved on a motion to dismiss.  Delta does not cite even a single case dismissing a copyright infringement claim at the pleading stage after applying such a framework.  Rather, Delta cites only cases involving motions for summary judgment on materially distinguishable facts.

For instance, Delta relies on *Yellowpages Photos, Inc. v. YP, LLC*, 418 F. Supp. 3d 1030 (M.D. Fla. 2019).  Dkt. 14-1 at 13–14.  There, unlike here, the plaintiff argued at summary judgment that the defendant had "lost its right to use [the plaintiff's] images" when the defendant allowed others who "fell outside the scope of the license" to use the images.  *Id.* at 1043.  Put another way, the plaintiff argued that the license had been effectively rescinded when the defendant breached it.  The court thus analyzed the competing evidence, determined that the provision at issue was a covenant, and limited the plaintiff to a breach claim.  *Id.* at 1044. CA, by contrast, does not allege that Delta lost its license to use DX NetOps on authorized devices.  Rather, CA alleges that Delta engaged in wholly unlicensed use by deploying (and reproducing) CA's copyrighted material on devices not

covered by Delta's license agreements.  Those allegations—accepted as true at the

pleading stage—preclude application of a condition-or-covenant framework here.

The other cases that Delta cites are similarly inapplicable here.  *See*

*Fantastic Fakes*, 661 F.2d at 482–84 (affirming grant of summary judgment to

defendant only "[a]fter lengthy discovery proceedings"); *Muench Photography,*

*Inc. v. McGraw-Hill Glob. Educ. Holdings, LLC*, 367 F. Supp. 3d 82, 88–93

(S.D.N.Y. 2019) (granting summary judgment to defendant on copyright

infringement claim where license agreement contained provisions requiring

payment of additional royalties if defendant exceeded the scope of authorized use);

*Jacob Maxwell*, 110 F.3d at 753–54 (affirming grant of summary judgment to

defendant when use of copyrighted material fell within scope of implied license).

This is unsurprising.  Even if the conditional nature of the Authorized Use

Limitation were ambiguous, it is "improper" to "interpret [a] contract when

considering [a] motion to dismiss" when the plaintiff alleges a plausible

interpretation of the contract that differs from the defendant's interpretation.

*BioHealth Med. Lab., Inc. v. Cigna Health & Life Ins. Co.*, 706 F. App'x 521, 524

(11th Cir. 2017).

In short, the existence of a license agreement between Delta and CA (or

between Delta and Kyndryl) does not absolve Delta of liability under the

Copyright Act for its willful and unauthorized use of CA's copyrighted material in an unlicensed manner. Delta's arguments to the contrary should be rejected.

**B.    Delta's unauthorized use of CA's software violates CA's exclusive rights under the Copyright Act.**

Delta next argues that CA's copyright infringement claim fails because CA supposedly is not seeking to enforce any right under the Copyright Act. Dkt. 14-1 at 15–22. This argument fails.

The Copyright Act grants CA the "exclusive rights" to, among other things, "reproduce the copyrighted work." 17 U.S.C. § 106. The Act "is intended to protect copyright holders from unconsented-to pirating by those unwilling to pay the full value of the works used." *MCA Television*, 171 F.3d at 1275.

CA's allegations pertaining to Delta's unauthorized deployment of CA's software state a claim under the Copyright Act. CA alleges that Delta has "over deployed" its copyrighted software and exceeded the scope of the Agreements by using "DXNOP2990 on thousands of unauthorized devices." Compl. ¶¶ 2, 35, 28, 43. Contrary to Delta's unsupported suggestion that it is permitted to use an unlimited number of copies of CA's software, Dkt. 14-1 at 15, the Master License Agreement provides that Delta cannot "make copies of or reproduce any part of the Licensed Program in any form without the prior written consent of CA." Dkt 14-2.

CA need not allege in its complaint the specific mechanism through which Delta reproduced CA's software to state a viable claim. That is instead an

appropriate topic for discovery.  *See Live Face on Web, LLC v. Emerson Cleaners, Inc.*, 66 F. Supp. 3d 551, 555 (D.N.J. 2014) ("The specific technological mechanism by which this is accomplished may be explored during discovery."). CA also need not use talismanic words such as "copying" or "reproducing." *GlobalOptions Servs., Inc. v. N. Am. Training Grp., Inc.*, 131 F. Supp. 3d 1291, 1299 (M.D. Fla. 2015) (denying motion to dismiss direct copyright infringement claim); *see also Elektra Entm't Grp., Inc. v. Barker*, 551 F. Supp. 2d 234, 238–39 (S.D.N.Y. 2008) (denying motion to dismiss even though plaintiff's allegations did "not describe specific acts of infringement" because allegations gave defendant "adequate notice").  All CA must allege is what is contained in the Complaint: that Delta exceeded the scope of its license by engaging in unauthorized and unlicensed over deployment and use of its software.  From CA's allegations, the Court can infer that Delta's unauthorized over-deployment reproduced the copyrighted software, infringing CA's copyrights.  *See Audio Sys. of Fla., Inc. v. Simplexgrinnell LP*, 2003 WL 22830002, at *4 n.3 (M.D. Fla. July 14, 2003) ("Plaintiff has alleged that Defendants have wrongfully used the software, for its intended purpose.  Such an act, if proven, constitutes 'copying.'").

The cases Delta cites are wholly inapposite.[5]  For example, Delta claims that *Bobbs-Merrill Co. v. Straus,* 210 U.S. 339 (1908) is "instructive," but that case involved a plaintiff seeking to impose price limitations on the resale of a book.  .  It bears no resemblance to CA's allegations that Delta is exceeding the scope of its license by using CA's software on thousands of unauthorized devices.

Delta also relies on *Storage Technology Corp. v. Custom Hardware Engineering & Consulting, Inc.,* 421 F.3d 1307, 1315-16 (Fed. Cir. 2005).  But in that case, the Federal Circuit reversed an order granting a preliminary injunction because the license authorized copying of the code "to enabl[e] the specific unit of Equipment" and the defendant was "merely turning on the machine on which the use of the code is authorized."  Here, Delta is doing the opposite.  It is using CA's software without a license to monitor unauthorized devices.

Delta's reliance on the hypothetical in *Storage Technology* is similarly misplaced.  Dkt 14-1 at 19.  The hypothetical involved a license "to make one and only one copy of a book with the caveat that the licensee may not read the last ten pages."  *Id.*  Delta's alleged wrongful conduct is akin to a licensee who made 100

---

[5] *See MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 940–41 (9th Cir. 2010) (vacating ruling on motion for summary judgment, holding antibot provision did not limit the license's scope and was therefore a contractual covenant, not condition); *Ticketmaster L.L.C. v. Prestige Ent., Inc.*, 306 F. Supp. 3d 1164, 1173–74 (C.D. Cal. 2018) ("Ticketmaster's limitations on the amount of times Defendants may request pages of the Website, send ticket reservation requests, or refresh transactions also do not implicate any exclusive right of copyright. These limitations serve to limit the number of transactions or to reduce server load").

unauthorized copies of the book, not to a licensee who merely read the last ten pages of a single copy of the book.

In sum, CA's allegations that Delta exceeded the scope of its license by using and over-deploying CA's software on thousands of unauthorized devices suffice at the motion to dismiss stage.  Notably, Delta admits it "use[s] copies of the DX NetOps software to monitor its network." Dkt 14-1 at 15.  Discovery will show the precise "nexus" between Delta's use of CA's software on unauthorized devices and CA's exclusive right to reproduction under the Copyright Act.  If the Court requires more, CA respectfully requests leave to amend.

## II.    Delta's factual dispute that it never agreed to certain contract terms cannot support dismissal of CA's Complaint.

Delta next argues that CA cannot state a claim for copyright infringement because Delta "never accepted" the definition of "Devices" in the SPD for DXNOP2990.  Dkt 14-1 at 22–25.  Delta contends that this definition was a "modification" of the Master License Agreement and so is not valid "unless made in writing and signed by the parties."  *Id.* at 4, 23.  This argument also fails.

To begin, Delta does not contest CA's allegation that Delta exceeded the Authorized Use Limitations even without the SPD.  Compl. ¶ 36.  Thus, even if the "modification" was invalid, Delta is liable for copyright infringement.

Regardless, Delta did accept the SPD and its definition of Devices. Consistent with the Master License Agreement, Delta executed "signed writings"

incorporating that definition: the 2023 and 2024 Order Forms. Those forms included Authorized Use Limitations for each Licensed Program, providing the metric by which to measure the licenses Delta could use. Compl. ¶¶ 22, 24. The metric in the 2023 and 2024 Order Forms is "Devices." *Id.* ¶ 24. Both Order Forms state, "All capitalized terms not defined in this Order shall have the meanings ascribed to them in the CA Agreement." Dkt. 14-3 at 2; Dkt. 14-4 at 2. In turn, the term "Devices" is defined in the SPD, which the Master License Agreement deems part of the "Licensed Program." Compl. ¶¶ 25–28; *id.* ¶ 19 (the Master License Agreement defines "Licensed Program" to include "all … documentation"). Accordingly, the 2023 and 2024 Order Forms are signed writings incorporating the SPD's definition of Devices. Delta's argument that "CA's Complaint identifies no Order Form that describes or even references the SPD" thus overlooks these provisions of the Order Forms, which do incorporate the SPD. Dkt. 14-1 at 23. Tellingly, Delta never explains where it would look for the definition of "Devices" if not the SPD.

Delta tries to avoid this conclusion by arguing that CA's interpretation would allow CA to modify the terms of an Order Form by unilaterally releasing a new SPD. Dkt. 14-1 at 23–25. But if Delta were to license a new Licensed Program covered by a new SPD, the parties would enter into a new Order Form. Thus, there would be a new "signed writing."

Even if the parties' agreements were ambiguous as to whether Delta accepted the SPD's requirements (they are not), Delta's competing interpretation of the Master License Agreement and related documentation is not a proper basis for dismissal. As explained above, Delta's interpretation is simply wrong. But at the very least, CA's alleged interpretation is plausible, so Delta's competing interpretation cannot be considered at this stage of the proceedings. *See, e.g.*, *BioHealth Med. Lab'y*, 706 F. App'x at 524 (holding that it is "improper" to "interpret [a] contract when considering [a] motion to dismiss" if the plaintiff alleges a plausible interpretation that differs from the defendant's interpretation).[6]

Delta's arguments about the "Kyndryl Contract" are also wrong. CA is not a party to the Kyndryl Contract and therefore cannot attest to the completeness or authenticity of the version attached to Delta's Motion without discovery. In fact, the Kyndryl Contract that Delta attaches to its Motion appears incomplete. █

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

---

[6] *Infogroup Inc. v. Off. Depot, Inc.*, 688 F. Supp. 3d 1179, 1184 (S.D. Fla. 2023), where the court simply read the agreement in question and concluded that it plainly "contain[ed] no limit on which subsidiary division/department within Office Depot may use the license" and plaintiff was asking the court to "discard portions of the license language," *id.* at 1185, is therefore entirely inapposite to this case where, at the very least, it is plausible that the SPD was expressly incorporated into the parties' agreements.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████        Thus, it should not be considered on a motion to dismiss before CA

has had a chance to take discovery into these materials within Delta's possession.

*See Amin v. Mercedes-Benz USA, LLC*, 349 F. Supp. 3d 1338, 1346 (N.D. Ga.

2018) (declining to take judicial notice of documents where the party citing the

documents did not "attempt[] to authenticate" the documents); *Horsley v. Feldt*,

304 F.3d 1125, 1135 (11th Cir. 2002) (refusing to consider incomplete documents

on a motion to dismiss).

    Even the limited material Delta attached to its Motion is consistent with

CA's allegations.  The version of the Kyndryl Contract attached to Delta's Motion

provides that Delta was only authorized to use CA's DXNOP2990 on 23,857

"Devices."  Dkt. 14-6 at Exhibit 2.3(B)(c).  CA alleges that it accepted an order

from Kyndryl, a CA partner, under which Kyndryl purchased DXNOP2990

licenses from CA for Delta's use from January 1, 2023, through December 31,

2027 ("Kyndryl Order").  Compl. ¶ 29; Ex. 2 (Kyndryl Order).  Pursuant to the

Kyndryl Order, Delta's DXNOP2990 licenses were subject to an Authorized Use

Limitation of 23,857 Devices.  Compl. ¶ 29; Ex. 2.  CA further alleges that, on

information and belief, the licenses Delta obtained pursuant to its agreement with

Kyndryl limited Delta's use of DXNOP2990 "pursuant to the terms and conditions

set forth in the Kyndryl Order and [SPD] for that software."  Compl. ¶ 30.  ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

    Delta contends that the SPD cannot be part of the "Kyndryl Contract"

because the former does not "reference" the latter.  Dkt. 14-1 at 24.  This is

incorrect.  The SPD references all "mutually agreed ordering document[s] (each a

'Transaction Document') under the applicable end user agreement or governing

contract . . . through which Customer obtained a license for the CA Software."

Dkt. 14-7 at 2.  Delta contends it obtained a license for CA's software through the

Kyndryl Contract.  Dkt. 14-1 at 5.  If that is true, the Kyndryl Contract is the

"Transaction Document" referenced in the SPD, which suffices to make the SPD part of that contract. *See* Compl. ¶¶ 29–30. At any rate, Delta's argument assumes that the Kyndryl Contract attached to its Motion is the only relevant agreement containing the only terms to which Delta is bound. No evidence has been provided for that self-serving conclusion and CA alleges otherwise. The license was granted by CA subject to certain limitations and requirements, including those in the SPD, and CA believes discovery will reveal that Kyndryl bound Delta to those same limitations (through "Related Documentation").

In sum, Delta cannot defeat CA's allegations by proffering incomplete contracts and then offering alternative interpretations of those agreements. *Horsley*, 304 F.3d at 1135; *BioHealth Med. Lab'y, Inc.*, 706 F. App'x at 524. CA alleges plausible interpretations of the relevant agreements and unauthorized use of CA's copyrighted software by Delta beyond the scope of those agreements. CA has thus stated a valid claim for copyright infringement.

## CONCLUSION

Delta's Motion should be denied. If the Court is inclined to grant the Motion, CA respectfully requests that any dismissal be without prejudice and that CA be granted leave to amend.

Respectfully submitted this 24th day of April, 2025.

HUESTON HENNIGAN LLP

By:  */s/ Alison L. Plessman*
       Alison L. Plessman
       *Admitted pro hac vice*
       California Bar No. 250631
       Hueston Hennigan LLP
       523 West 6th Street, Suite 400
       Los Angeles, CA 90014
       213-788-4542
       aplessman@hueston.com

       Abraham Weiss
       *Admitted pro hac vice*
       Hueston Hennigan LLP
       New York Bar No. 00193108
       1 Little West 12th St.
       New York, NY 10014
       212-229-6480
       aweiss@hueston.com

CAPLAN COBB LLC

By:  */s/ Ashley C. Brown*
       Michael A. Caplan
       Georgia Bar No. 601039
       Ashley C. Brown
       Georgia Bar No. 287373
       Erin M. Victoria
       Georgia Bar No. 285342
       Caplan Cobb LLC
       75 Fourteenth Street NE, Suite 2700
       Atlanta, Georgia 30309
       Tel: (404) 596-5600
       Fax: (404) 596-5604

mcaplan@caplancobb.com
abrown@caplancobb.com
evictoria@caplancobb.com

*Attorneys for Plaintiff CA, Inc.*

## <u>LOCAL RULE 7.1(D) CERTIFICATION</u>

The undersigned counsel certifies that the foregoing document has been prepared with one of the font and point selections approved by the Court in LR 5.1(B).

This 24th day of April, 2025.

/s/ Abraham Weiss
Abraham Weiss
Hueston Hennigan LLP
1 Little West 12th St.
New York, NY 10014
212-229-6480
aweiss@hueston.com

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that: I, Alison Plessman, am over the age of eighteen (18) and not a party to the within action.  I am employed in the law firm of Hueston Hennigan LLP, 523 West 6th Street, Suite 400, Los Angeles, CA 90014.

On April 25, 2024, I caused to be electronically filed the following document using the Northern District of Georgia's Electronic Case Filing System:

**CA, INC.'S OPPOSITION TO DELTA AIR LINES, INC.'S MOTION TO DISMISS**

The ECF system is designed to send an e-mail message to all parties or counsel of record in the case, which constitutes service.  The parties and counsel of record served by e-mail in this case are found on the Court's Electronic Mail Notice List.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 24, 2025, at Los Angeles, California.

*/s/ Alison Plessman*
Alison Plessman

*Attorney for Plaintiff CA, Inc*